UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DOREEN R. HOSKINS,

        Plaintiff,

v.                                                                                    Case No. 1:05-CV-816

PRIDGEON & CLAY, INC.                                          HON. GORDON J. QUIST

        Defendant.

_____/

## OPINION

      Plaintiff, Doreen R. Hoskins ("Hoskins"), has sued Defendant, Pridgeon & Clay, Inc. ("P & C"), alleging that P & C violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 to 2654, by terminating her for alleged FMLA fraud.  Hoskins alleges that P & C violated the FMLA by interfering with her FMLA rights and by retaliating against her for exercising her rights under the FMLA.  Now before the Court is P & C's motion for summary judgment.  For the reasons set forth below, the Court will grant P & C's motion and dismiss Hoskins' complaint with prejudice.

## I. Facts

      P & C is a designer of metal stamping and assembly products, headquartered in Grand Rapids, Michigan.  Hoskins was employed full-time by P & C as a machine operator from April 1, 2000, until her termination on September 13, 2005.  Rafael Portillo ("Portillo"), Hoskins' team leader, or lead person, was responsible for assigning team members to particular machines in the plant and inspecting the quality of parts.  Other than assigning machine work, Portillo was not

responsible for employment decisions or employee evaluations. Greg Schuur ("Schuur") supervised Hoskins and Portillo and had input on employment decisions.

Hoskins suffers from Chronic Obstructive Pulmonary Disease ("COPD") and/or asthma. In January 2005, Hoskins requested intermittent medical leave under the FMLA for her condition, which was apparently exacerbated by the use of certain coolants that P & C used at its plant. Hoskins obtained an FMLA certification from her doctor, and P & C approved her request for the calendar year of 2005.

P & C has a no-fault attendance policy, pursuant to which employees accumulate unexcused work hours on their attendance record for a period of one year on a rolling basis.[1] The policy incorporates a progressive discipline procedure, first employing a written warning and attendance counseling at 80 accumulated hours, then disciplinary time off and attendance counseling at 88 accumulated hours, and finally termination at 96 accumulated hours. On July 28, 2005, Hoskins received a written attendance warning notifying Hoskins that she had a number of unexcused absences apart from her FMLA absences (which are not counted as unexcused absences), although by early September 2005, Hoskins' no-fault hours had dropped to 77.13 hours – below the level at which employees receive a warning.

On Thursday, September 1, 2005, Hoskins asked Portillo if she could have the following day, Friday, September 2, 2005 – the day before the Labor Day weekend – off as a vacation day. According to Portillo, Hoskins wanted the day off in order to have a longer weekend. (Portillo Dep. at 29-30.) Hoskins, on the other hand, claims that she wanted the day off because she was feeling

---

[1]For example, accumulated no-fault hours that were incurred more than one year prior to the date in question are removed from the employee's total hours.

congested and was using her inhaler.  (Hoskins Dep. at 25.)  In any event, Portillo told Hoskins that he had no problem with her request but that she would need to obtain approval from Schuur.  Schuur denied Hoskins' request because too many other employees already had the day off.  Unhappy about Shuur's answer, Hoskins later told Portillo, "I'm going on FMLA then."  (Portillo Dep. at 31.)  Portillo subsequently conveyed this information to Schuur.  (Schuur Dep. at 30-31.)

The next day, Hoskins notified P & C through an automated system that she would be taking the day off.  Due to the Labor Day holiday, Hoskins was not scheduled to work again until Tuesday, September 6.  That day she notified P & C again that she would be taking another day off.  Hoskins says that she took both days off because she was having breathing problems.  (Hoskins Dep. at 27-38.)

Hoskins returned to work on Wednesday, September 7, and submitted a written note to P & C stating that she was off work "[d]ue to [her] FMLA."  According to Portillo and Schuur, sometime that day, Hoskins told each of them in separate conversations that she missed work on Friday, September 2 to watch her grandchildren.[2]  (Portillo Dep. at 37, 40, 45; Schuur Dep. at 28-29, 40.)  After speaking with Portillo, Schuur reported what Hoskins had said to him and Portillo to Dana Myers in P & C's Human Resources Department.  (Schuur Dep. at 30-31.)  Schuur told Myers that he "had a suspicion that there [was] going to be FMLA turned in because [he] denied her vacation

---

[2]Hoskins testified that she does not recall seeing Schuur on September 7 or having a conversation with him about why she was absent from work on September 2 and September 6.  (Hoskins Dep. at 42.)  She said that she recalls having a conversation with co-workers in Portillo's presence in which she said that she was sick and her grandson had been in the hospital that weekend.  (*Id.* at 43-44.)  She testified, however, that she did not watch her grandchildren at any time during the period of September 2 through September 6.  (*Id.* at 44.)

slip."[3]   (*Id.* at 33.)  Myers, in turn, relayed this information to Joni LaHuis ("La Huis"), P & C's

Human Resources Manager.  La Huis then spoke with Portillo and Schuur about Hoskins' statements

and asked each of them to review and sign a written statement that LaHuis prepared, documenting

what Hoskins had told them.  Schuur's written statement said:

> On Wednesday, September 7th, Doreen willingly informed me that her absence on
> Friday, September 2nd was due to the fact that her daughter had no baby sitter.  So
> therefore, Doreen missed work to watch the children.

(Schuur 9/12/05 Statement.)  Portillo's statement said:

> On Wednesday, September 7th Doreen willingly informed me that her absence on
> Friday, September 2nd was due to a family crisis (nothing to do with her asthma or
> depression).  Doreen told me that she watch [sic] her grandchildren that day.

(Portillo 9/13/05 Statement.)  Based upon the information received from Portillo and Schuur, La

Huis, in consultation with Julie Church-Krafft, P & C's Human Resources Director, made the

decision to terminate Hoskins for violating company Rule #5: "Making false statements or omission

of pertinent information in connection with any employment record, documentation of time worked,

or Company record."  (9/13/05 Employee Status Change; LaHuis Dep. at 58-59, 84-86; Church-

Krafft Dep. at 14-15.)

On Tuesday, September 13, LaHuis called Hoskins into her office for a meeting, at which

Schuur was also present.  Prior to the meeting, LaHuis had prepared an Employee Status Change

form stating that Hoskins' employment had been terminated for violating company Rule # 5.  At the

beginning of the meeting, LaHuis informed Hoskins of the decision to terminate her employment

and told her about the statements from Portillo and Schuur that Hoskins had stated that she was

---

[3]There is no dispute that if Hoskins in fact missed work in order to watch her grandchildren, this would not be a valid FMLA absence because Hoskins was not "in loco parentis" as required by the FMLA.  *See* 29 C.F.R. §§ 825.112(a), 825.113; *Dillon v. Md.-Nat'l Capital Park & Planning Comm.*, 382 F. Supp. 2d 777, 787 (D. Md. 2005) ("The mere fact of being a grandparent does not necessarily give rise to in loco parentis status.").

4

watching her grandchildren on Friday September 2.  What occurred during the remainder of the meeting is disputed.  According to LaHuis, Hoskins admitted that she was off work watching a sick grandchild and she stated her view that it was "a very good reason" to be off work and P & C should accept it.  (LaHuis Dep. at 61-62.)  Hoskins, on the other hand, testified that she told LaHuis that she missed work on September 2 because she was sick, and she denied telling LaHuis that she was watching a sick grandchild.  (Hoskins Dep. at 46-48.)  Schuur's recollection is less clear.  He testified that Hoskins told LaHuis that she was gone due to FMLA reasons and that she had an asthma attack, although he also stated that "[t]he story changed from Doreen a couple different times" and that he felt that her claim about asthma was a "last ditch effort" to save her job after she was informed of the termination.  (Schuur Dep. at 44, 47.)  In any event, LaHuis terminated Hoskins' employment at the conclusion of the meeting.

Following the termination, and shortly after Hoskins filed the instant lawsuit, P & C discovered that Hoskins failed to disclose certain information on her employment application.  In particular, in response to the question, "Have you ever been convicted of a crime?" Hoskins checked "No."  P & C learned that less than two years before Hoskins submitted her application, she was convicted of operating a motor vehicle under the influence of alcohol, for which she paid a fine, spent eleven days in jail, and spent twelve months on probation.

## II.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

5

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III.  Discussion

The FMLA provides eligible employees with a maximum of twelve weeks of unpaid leave in a given twelve month period to attend to certain family and medical matters. 29 U.S.C. § 2612(a). Among other things, an employee may take FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Upon return from FMLA leave, an employer must restore an employee to her former job or another position with equivalent pay, benefits, and conditions of employment. 29 U.S.C. § 2614(a)(1). In addition, the FMLA prohibits an employer from retaliating against an employee who exercises her rights under the FMLA. 29 U.S.C. § 2615(a)(2). An employer who violates the FMLA is liable to the injured employee for compensatory damages, back pay, and equitable relief. 29 U.S.C. § 2617(a)(1).

The FMLA provides for two different types of claims or theories of liability. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). The first theory is the "entitlement" or "interference" theory, which is based upon the substantive rights created by the FMLA. *See Arban*, 345 F.3d at 401. An employer is liable under this theory if it interferes with an employee's FMLA-created right to medical leave or to reinstatement following the leave. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right

6

provided under this title.").  To prevail on this type of claim, an employee need only show that she was denied an entitlement under the FMLA.  *See Hoge*, 384 F.3d at 244.  "'The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve-week leave or reinstatement after taking a medical leave.'" *Arban*, 345 F.3d at 401 (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)).  The employer's intent is irrelevant to such a claim.  *See Hoge*, 384 F.3d at 244; *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).  The "retaliation" or "discrimination" theory provides a separate basis for a FMLA claim.  It arises under 29 U.S.C. § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." *See also* 29 C.F.R. § 825.220(c) (prohibiting employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").  As noted above, Hoskins asserts both types of claims.  The Court will first address the retaliation claim.

## A.      Retaliation Claim

The Sixth Circuit has held that a plaintiff who has no direct evidence of retaliation can establish an FMLA retaliation claim through circumstantial evidence under the *McDonnell Douglas* burden-shifting framework.  *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).  Under the *McDonnell Douglas* framework, a plaintiff relying upon indirect evidence must first establish a prima facie case.  *Id.*  If the plaintiff establishes a prima facie case, a presumption of intentional discrimination arises, and the burden then shifts to the defendant to set forth "'a legitimate, nondiscriminatory reason' . . . for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747 (1993) (emphasis

in original) (citations omitted) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981)).  If the defendant meets its burden of production, the plaintiff must then prove by a preponderance of the evidence that the defendant's conduct was motivated by unlawful discrimination rather than by the reasons articulated by the defendant.  *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *Burdine*, 450 U.S. at 252-53, 101 S. Ct. at 1093-94).  Notwithstanding the burden-shifting approach, the plaintiff retains the burden of persuasion at all times.  *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir. 1993) (per curiam).  In order to establish a prima facie case of retaliation, a plaintiff must show: "(1) he availed himself of a protected right under the FMLA . . . , (2) he was adversely affected by an employment decision . . . , and (3) . . . a causal connection between his exercise of a right under the FMLA and the adverse employment decision."  *Skrjanc*, 272 F.3d at 314.

In its moving brief, P & C impliedly concedes or assumes that Hoskins has established a prima facie case of retaliation and focuses exclusively upon Hoskins' ability to demonstrate that P & C's reason for termination – Hoskins' violation of Rule No. 5 by falsely representing that her absence on September 2 was FMLA-qualifying leave – is pretext.  P & C contends that Hoskins cannot do so because it has shown that it reasonably relied upon particularized facts in determining that Hoskins falsely represented that she was taking FMLA leave for a proper purpose and, therefore, it is protected from liability by the "honest belief" rule as adopted in the Sixth Circuit in *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998).[4]  Hoskins contends that the "honest belief" rule does not apply because P & C's reliance upon the "facts" it cited as supporting it decision was not reasonable and, furthermore, based upon the weaknesses and inconsistencies in P & C's proffered

[4]The Sixth Circuit has applied the honest belief rule in the context of FMLA retaliation claims.  *See Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006).

8

legitimate reason, a finder of fact could conclude that P & C's true motivation for terminating Hoskins was unlawful retaliation.

Initially, the Court addresses Hoskins' argument that certain alleged statements by Portillo constitute direct evidence and are probative of P & C's discriminatory intent. Specifically, Hoskins cites the deposition testimony of Hoskins' co-worker, Glenda Quinn, about a statement that Portillo made to Quinn the day before Hoskins' termination, when Hoskins was absent from work. Quinn described the circumstances as follows: "[Portillo] walked over with the book and the schedule in his hand, hooked me up on my machine and he said, 'Man, Doreen is going to get fired, she's not here enough, she's not reliable, I need her here to work on that machine.'"[5] (Quinn Dep. at 17.) Hoskins contends that Portillo's statement can be considered direct evidence of P & C's discriminatory intent because it tends to show that P & C terminated Hoskins for excessive absences, some of which were approved FMLA absences. Contrary to Hoskins' assertion, Portillo's statement is not direct evidence of P & C's discriminatory intent, nor is it evidence of pretext for purposes of a circumstantial case. First, although Hoskins states that Portillo was "[a]lso involved in the termination," (Pl.'s Br. Opp'n at 2), there is no evidence to support this assertion. Rather, the evidence, which is not in dispute, shows that LaHuis made the decision to terminate Hoskins, with approval from Church-Krafft. While Portillo provided information to LaHuis that she ultimately relied upon to support her termination decision, there is no evidence that he participated in the actual decision-making process or that he was even aware that a decision had been reached to terminate Hoskins' employment for FMLA fraud/abuse. Moreover, Portillo testified that he does not make

---

[5]It appears to the Court that Quinn was mistaken about one aspect of her testimony, namely, the day on which the conversation occurred. The evidence shows that Hoskins returned to work on Wednesday, September 7, 2005, worked the following day, September 8, and took a vacation day on Friday, September 9. (Hoskins Dep. at 39, 43.) There is no evidence that Hoskins was absent from work again on Monday, September 12, the day before her termination.

termination decisions.    (Portillo Dep. at 11.)    "Unless the statements or conduct of nondecisionmakers can be imputed to the ultimate decisionmaker, such statements or conduct [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 724 (6th Cir. 2004) (internal quotation marks omitted).  Second, given the fact that Hoskins already had ten unexcused, non-FMLA absences between February and July of 2005, Portillo's comment – on a day that Hoskins was absent from work for reasons unrelated to the FMLA – is, at best, ambiguous and not probative of discriminatory animus because Portillo may very well have been referring to Hoskins' record of unexcused absences. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998).

Hoskins may establish that P & C's proffered reason was a mere pretext by showing that 1) it had no basis in fact; 2) it was not the actual reason; or 3) it was insufficient to explain P & C's decision to terminate Hoskins.  *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).  Hoskins seeks to demonstrate pretext through the first avenue, by showing that there was no basis in fact for P & C's conclusion that Hoskins engaged in FMLA fraud/abuse when she turned in a slip stating that her absence on September 2 was for FMLA purposes.  A plaintiff may not show pretext by simply denying that the employer's reason for the adverse action is true.  *See Hsughton v. Orchid Automation*, No. 05-6330, 2006 WL 3368793, *6 (6th Cir. Nov. 20, 2006) ("Absent some substantiating evidence, a plaintiff's mere denial of 'the defendant's articulated legitimate reason . . . is insufficient for a race discrimination claim to withstand a motion for summary judgment.'") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).  However, even if a plaintiff can show that the employer did not have cause to take the adverse action against the plaintiff for the asserted reason, an inference of pretext is not warranted where the employer can demonstrate an

honest belief in its proffered reason.  *See Smith*, 155 F.3d at 806.  The "honest belief" rule, as

adopted by the Sixth Circuit, provides that "as long as an employer has an honest belief in its

proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that

the reason was pretextual simply because it is ultimately shown to be incorrect."  *Majewski v.*

*Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith*, 155 F.3d at

806).  To be entitled to the benefit of this rule, the employer must show that its belief was

"reasonably based on particularized facts rather than on ignorance and mythology."  *Smith*, 155 F.3d

at 806.  Moreover, "the protection afforded by the rule is not automatic," because the employee must

have an "opportunity to produce 'proof to the contrary,'" such as by showing that "'the employer

made an error too obvious to be unintentional.'"  *Id.* at 807 (quoting *Fischbach v. Dist. of Columbia*

*Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).  On the other hand, the Sixth Circuit does not

require a flawless investigation:

> In deciding whether an employer reasonably relied on the particularized facts
> then before it, we do not require that the decisional process used by the employer be
> optimal or that it left no stone unturned.  Rather, the key inquiry is whether the
> employer made a reasonably informed and considered decision before taking an
> adverse employment action.

*Smith*, 155 F.3d at 807.  *See also Haughton v. Orchid Automation*, No. 05-6330, 2006 WL 3368793,

at *7 (6th Cir. Nov. 20, 2006) (stating that the employer's "investigation need not be perfect").

At the time LaHuis made her decision to terminate Hoskins' employment for falsifying the

reason for her absence on September 2, LaHuis had the following information before her:

1.     On September 1, Schuur had denied Hoskins' request for a vacation day and Hoskins
       stated that she would take FMLA leave for September 2 instead of vacation.

2.     On September 7, Hoskins turned in a note stating that her absence on September 2
       was for FMLA purposes.

3.      Portillo and Schuur both told LaHuis that on September 7, the day Hoskins returned
to work, she told them that she missed work on September 2 in order to babysit her
grandchild (or grandchildren).  In his deposition, Portillo repeatedly confirmed his
version of Hoskins' comments when he testified that Hoskins told him that "she had
to babysit on that Friday," (Portillo Dep. at 37); that she "[j]ust started to tell [him]
that she had to babysit that Friday," (*Id.* at 40); and that "she was babysitting for
Friday and not FMLA," (*Id.* at 45).  Portillo conveyed this information to LaHuis.
(*Id.* at 46-47, 50-51.)  Schuur also confirmed in his deposition his version of what
Hoskins told him when he testified that "[s]he sa[id] Friday she was watching the
kids because one of them was sick."  (Schuur Dep. at 40).  Schuur also relayed that
information to LaHuis.  (Schuur Dep. at 35-37.)

4.      Portillo and Schuur both signed written statements that LaHuis prepared based upon
what they told her.  These statements were voluntary and unsolicited, and neither
Portillo nor Schuur had any apparent motive to lie.

5.      Hoskins' precarious attendance record provided ample motive for her to claim that
her absence qualified as FMLA leave.

These are sufficiently particularized facts that would have provided a reasonable basis for LaHuis

to conclude that Hoskins submitted a false reason for her September 2 absence.  LaHuis explained

that the basis for her belief was that she "had two people of leadership that . . . told [her] that, yes,

Doreen, in fact, had told them that she was off September 2nd babysitting her grandchildren."

(LaHuis Dep. at 61.)  This evidence is sufficient to show that P & C had an honestly held belief that

it had cause to terminate Hoskins for FMLA fraud.

Hoskins contends that P & C has failed to demonstrate reasonable reliance for several

reasons.  First, she contends that P & C simply jumped to the conclusion that Hoskins could not

babysit, for any period of time, while on FMLA leave.  Second, she argues that no one from P & C

spoke to her to see whether she was actually sick or babysat that day, nor did P & C try to determine

whether Hoskins had any witnesses who would support her claim that she was sick.  Third, she

contends that LaHuis, who drafted the written statements of Portillo and Schuur, reached her own

conclusion about Hoskins misusing FMLA time without a reasonable factual basis.  Finally, she contends that P & C cannot prove that she was not sick with asthma or COPD symptoms on September 2, nor can it show that she babysat any of her grandchildren during working hours that day.  While Hoskins asserts several of these arguments in her analysis of her entitlement claim, they actually relate to the retaliation claim because they concern P & C's intent or motive for terminating Hoskins.  Thus, the Court considers them relevant to the retaliation aspect of this case.

None of Hoskins' arguments are sufficient to save her retaliation claim from summary judgment.  First, by arguing that P & C improperly assumed that an employee may not babysit while on FMLA leave, Hoskins misconstrues P & C's reason for terminating her employment.  P & C's reason for the termination was not that Hoskins babysat while on FMLA leave.  Rather, P & C concluded that Hoskins falsely claimed that her absence on September 2 was covered FMLA leave because she admitted that she missed work on that day to babysit, which is not an FMLA-protected activity.  Whether an employee may babysit during a valid FMLA leave is therefore not a relevant issue in this case.  The Court has reviewed the cases that Hoskins has cited in connection with this argument, *Jennings v. Mid-American Energy Co.*, 282 F. Supp. 2d 954 (S.D. Iowa 2003), and *Stallings v. Hussmann Corp.*, 447 F.3d 1041 (8th Cir. 2006), and finds them distinguishable from the instant case.  In *Jennings*, the court actually granted summary judgment on the plaintiff's retaliation claim, leaving only her interference claim.  *See Jennings*, 282 F. Supp.2d at 962-64.  The issue regarding the interference claim was whether the plaintiff was entitled to restoration of employment based upon her alleged misuse of FMLA leave.  There was no dispute that the plaintiff took leave for a valid purpose, but on her way home from work while on leave, she stopped at a store to do some shopping.  The employer argued that this constituted misuse of FMLA leave.  *See id.* at

961.  In this case, the issue is not whether Hoskins could engage in some activity during valid FMLA leave, but instead whether P & C had an honest belief that Hoskins misrepresented time off from work as valid FMLA leave.  In *Stallings*, the posture was reversed, with the court dismissing the interference claim but finding a genuine issue of material fact regarding the retaliation claim.  *See Stallings*, 447 F.3d at 1051-53.  The evidence regarding the retaliation claim differed from this case because the plaintiff in *Stallings* alleged that he told his supervisor that he intended to take FMLA leave to both move his father and to provide for his father's care.  Although the plaintiff admitted that he did not move his father during the two weeks of leave time, the court found that summary judgment was improper because if the plaintiff told his employer that he intended to both move and care for his father, the plaintiff's failure to move his father would not justify the employer in reasonably believing that the plaintiff lied about his reason for taking FMLA leave.  *See id.* at 1053.  In contrast to this case, there was no evidence in *Stallings* that the plaintiff had admitted to a co-worker and a supervisor that his leave was not for an FMLA-qualifying reason.  Had there been such evidence, the court may have well concluded that the employer reasonably believed that the plaintiff was lying about why he took FMLA leave.

Second, an employer is not required to interview the employee or the employee's witnesses in order to obtain the benefit of the "honest belief" rule, as Hoskins suggests.  Again, there is no requirement "that the decisional process used by the employer be optimal or that it left no stone unturned."  *Smith*, 155 F.3d at 807.  In fact, the court in *Smith* found that the employer reasonably relied upon particularized facts in concluding that the employee had falsely stated on his driver's license examination form that he was not narcoleptic, even though the employer never personally interviewed the plaintiff.  *See id.* at 805, 809.  The Sixth Circuit recently confirmed that an

employer's failure to interview the employee before making a decision does not preclude the application of the rule:

> McConnell claims that the decision to fire him was made solely upon this one conversation with McHugh and without first questioning him as to the validity of the claim.   Assuming this is true, that does not mean that Mr. Smith's [the decisionmaker] belief was not honestly held.

*McConnell v. Swifty Transp., Inc.*, 198 F. App'x 438, 444 (6th Cir. 2006).  Moreover, it is difficult to see how interviewing Hoskins would have compelled LaHuis to reach a different conclusion.  As noted above, Hoskins claims that she did not watch her grandchildren at all during that weekend. La Huis would have thus been confronted with Hoskins' version that she was sick the entire weekend and did not babysit and Portillo's and Schuur's version that Hoskins said that she was babysitting on September 2.  There is no reason to believe that LaHuis would not have chosen to believe Portillo's and Schuur's statements as true even if she had interviewed Hoskins.

Third, as discussed above, LaHuis had ample evidence before her to support a reasonable belief that Hoskins had missed work in order to babysit her grandchildren, and there is no evidence that LaHuis reached this conclusion on her own .  LaHuis testified that she relied upon the statements of Portillo and Schuur – employees in leadership positions – in reaching her decision.  Although Hoskins makes much of the fact that LaHuis typed the statements for Portillo and Schuur to sign, Schuur testified that LaHuis did not change anything in his statement, (Schuur Dep. at 36), and it is undisputed that both Schuur and Portillo read and signed their statements.[6]  (Schuur Dep. at 35-36;

---

[6]Hoskins attempts to distinguish this case from *Smith* on the basis that the employer in that case relied upon letters from the plaintiff's treating physicians, the medical opinion expressed by the company doctor, and medical notes containing the plaintiff's own admission that he suffered form narcolepsy, whereas in this case P & C's determination was based solely upon the personal opinions of LaHuis and Church-Krafft that Hoskins could not babysit while on FMLA leave.  As set forth above, this argument mischaracterizes P & C's reason for terminating Hoskins, but, in any event, is inaccurate because LaHuis based her decision upon facts related by Portillo and Schuur, not upon an uninformed opinion on a subject with which she was unfamiliar (such as narcolepsy as in *Smith*).

Portillo Dep. at 49-50.)  In short, Hoskins has failed to show that LaHuis made some error that was too obvious to be unintentional or that her belief was not honestly held.[7]

Finally, Hoskins' argument that P & C cannot prove that she committed FMLA fraud is irrelevant to the issue of whether P & C had an "honest belief."  This argument lacks merit because a requirement that the employer be able to demonstrate that the employee engaged in misconduct in order to obtain the benefit of the "honest belief" rule would eviscerate the rule itself.[8]  Thus, Hoskins' assertions at oral argument that genuine issues of material fact remain regarding whether Hoskins actually took time off for FMLA purposes, what Schuur actually told LaHuis, and what Portillo actually told LaHuis must be rejected.

As noted above, Hoskins cites other grounds for concluding that P & C's reason is pretext, which are: (1) the proximity between the FMLA leave and termination; (2) the direct evidence of discriminatory intent through Portillo's statement; (3) the inconsistencies between the testimony of Portillo and Schuur and their written statements; (4) the lack of any reasonable reliance upon particularized facts; and (5) other evidence demonstrating discriminatory intent.  The Court has already addressed Hoskins' second, third, and fourth grounds.  With regard to temporal proximity, while it is true that temporal proximity, *in combination with other evidence*, may suffice to show pretext, *see Skrjanc*, 272 F.3d at 317 (noting that "temporal proximity is insufficient in and of itself

---

[7]In fact, the Court notes that *Jennings*, cited by Hoskins and discussed above, actually supports P & C's position.  In that case the employer asserted that it had an honestly held belief that the plaintiff was misusing FMLA time and the court agreed, granting summary judgment to the employer.  It bears noting that the evidence supporting the employer's belief in that case was no stronger, and in many ways was weaker, than the evidence supporting P & C's belief in this case.  *See Jennings*, 282 F. Supp. 2d at 957, 963-64.

[8]The Court also notes that nothing in the record, including the testimony of Hoskins and her witnesses, shows that P & C's conclusion that Hoskins engaged in FMLA fraud was incorrect.  That is, the statements of Portillo and Schuur still support P & C's decision, even though Hoskins attempts to poke holes in their statements.

16

to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual"), the temporal proximity between the protected activity (FMLA leave) and the adverse employment action (termination) in this case is of little evidentiary value because the reason for the termination – FMLA fraud – and the termination decision would generally be expected to occur in close proximity to each other.  Hoskins' only other evidence is evidence of "ongoing antagonism." This evidence includes the fact that P & C required Hoskins to submit a new health care certificate for absences of more than three days and for conditions, such as "chest congestion" or bronchitis, that may not have been related to Hoskins' COPD.  In addition, Hoskins cites an e-mail from Dana Myers in the Human Resources Department to Therese Labenz, another Human Resources employee, regarding Hoskins, in which Myers stated:  "You did fine.  Nice try on the chest congestion because she has FMLA chronic for Asthma.  Tell her to be thankful that they don't charge her $25.00 like most doctors do."  (10/25/04 email from Myers to Labenz.)  Finally, Hoskins notes that P & C held back Hoskins' holiday pay for Labor Day "due to suspicion" that Hoskins was not entitled to holiday pay, in spite of its policy that employees on FMLA leave are entitled to holiday pay.

Hoskins' evidence is insufficient to show antagonism toward Hoskins based upon her assertion of FMLA rights.  Regarding P & C's certification requirements, it is undisputed that it was P & C's practice to require new certifications from employees for leaves longer than three days (although it appears that P & C has since changed this policy to not require new certifications) and that it was not directed solely at Hoskins.  (Church-Krafft Dep. at 40-41; Myers Dep. at 9-10.)  In addition, Hoskins does not dispute that P & C granted all of Hoskins' requested FMLA leave. Regarding the Myers e-mail, it is not at all clear that Myers' use of the words "Nice try" are indicative of animus toward Hoskins, but even so, Myers wrote the e-mail almost a year before

17

Hoskins was terminated, and, more importantly, there is no evidence that Myers was involved in the decision to terminate Hoskins.  Finally, the fact that P & C withheld Hoskins' holiday pay due to its suspicion about her FMLA fraud/abuse is unremarkable, because it would be expected that an employer would not give an employee holiday pay if it had a legitimate reason to question the employee's entitlement to such pay, as in this case.   Thus, P & C is entitled to summary judgment on this claim.

**B.   Entitlement Claim**

In order to establish an entitlement claim, a plaintiff must show that: (1) she was an eligible employee; (2) the defendant is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave the defendant notice of her intent to take leave; and (5) the defendant denied her FMLA benefits or interfered with FMLA rights to which she was entitled.  *See Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).  The parties agree that only the last element is at issue in this case.

In its opening brief, P & C argued that it was entitled to summary judgment on Hoskins' interference claim because Hoskins was incapable of returning to work.  That is, it argued that because of its discovery of Hoskins' failure to report her criminal conviction on her employment application, Hoskins' employment was subject to termination and, therefore, Hoskins was incapable of returning to work.  In making this argument, P & C relied upon the Sixth Circuit's decision in *Edgar v. JAC Products, Inc.*, 443 F.3d 501 (6th Cir. 2006), in which the Sixth Circuit recently held that an employer does not interfere with an employee's right to reinstatement where it terminates an employee who is incapable of returning to work for medical reasons, even though it did not learn that the employee was incapable of returning to work until after it terminated the employee.  P & C thus

sought to analogize its discovery of Hoskins' omission on her employment application to the situation in *Edgar*.  In its reply brief, however, P & C merely asserts that it is entitled to summary judgment because it is undisputed that P & C granted Hoskins all of the FMLA leave that she requested and that it reinstated her to her position when she returned from leave.

The Court agrees with P & C's latter argument and, thus, finds it unnecessary to resolve the after-acquired evidence issue.  As P & C correctly notes, Hoskins took leave on both September 2 and September 6, and she was reinstated to her position when she returned to work on September 7.  P & C took no action toward Hoskins until after Schuur reported that Hoskins told him and Portillo that she missed work on September 2 because she was babysitting her grandchildren.  *See Stallings*, 447 F.3d at 1051 (concluding that the plaintiff's interference claim failed where the employer granted every request for leave, did not impede the plaintiff's use of FMLA leave, and returned the plaintiff to his position, even though it subsequently raised questions regarding the use of leave).  The fact that P & C had suspicions that Hoskins was abusing her FMLA leave, investigated those suspicions, and ultimately terminated Hoskins for falsely reporting that her absence on September 2 was FMLA qualifying leave, thus does not give rise to an interference claim. *See Bratcher v. Subaru of Ind. Auto., Inc.*, 458 F. Supp. 2d 753, 763 (S.D. Ind. 2006) (rejecting the plaintiff's interference claim because, among other things, the plaintiff "presented no case law suggesting that an employer cannot conduct investigations into suspected FMLA abuse").  As one court has stated:

> [N]othing in the FMLA prohibits an employer from investigating allegations of dishonesty or from terminating an employer who violates company policies governing dishonesty.  The FMLA does not shield an employee from termination simply because the alleged misconduct concerns use of FMLA leave.

*Kitts v. Gen. Tel. North, Inc.*, No. 2:04-CV-173, 2005 WL 2277438, at *11 (S.D. Ohio Sept. 19, 2005).  Thus, Hoskins was not entitled to any special protection from P & C's company rules merely

19

because she invoked her FMLA rights.  Accordingly, P & C is also entitled to summary judgment on this claim.

### IV.  Conclusion

For the foregoing reasons, the Court will grant P & C's motion for summary judgment.

An Order consistent with this Opinion will be entered.


Dated:  April 3, 2007                                        _____/s/ Gordon J. Quist_____
                                                                          GORDON J. QUIST
                                                                          UNITED STATES DISTRICT JUDGE